UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KERMIT ROBERTS, : | |
| : | |
| Plaintiff, : | |
| v. : | No. 2:14-cv-04847 |
| : | |
| CAROLYN W. COLVIN, : | |
| Acting Commissioner of the Social Security : | |
| Administration, : | |
| : | |
| Defendant. : | |

## MEMORANDUM OPINION

Plaintiff's Request for Review, ECF No. 9 – Denied
Plaintiff's Objections to Report and Recommendation, ECF No. 19 – Overruled
Report and Recommendation, ECF No. 20 -  Approved and Adopted

**Joseph F. Leeson, Jr.**                                                                                      **September 30, 2016**
**United States District Judge**

Kermit Roberts brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the decision of Carolyn W. Colvin ("Commissioner") denying Roberts's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. After de novo review of the administrative record, Magistrate Judge Timothy R. Rice's Report and Recommendation ("R&R"), Roberts's Objections thereto, and the record in this case, the Court approves the R&R, denies Roberts's Request for Review, and affirms the Commissioner's decision.

## I.     Background

### A.     Procedural Background

Roberts filed for DIB benefits on September 8, 2011, alleging disability commencing on September 7, 2010, due to severe high blood pressure, pheochromocytoma, and obstructive sleep

1

apnea. Administrative Record ("R.") at 129, 161-71, ECF No. 6. He also filed for SSI benefits on January 18, 2011. R. 23. The claims were initially denied on November 15, 2011. R. 23. On May 7, 2013, in Wilkes Barre, Pennsylvania, Roberts appeared and testified at a hearing before Administrative Law Judge ("ALJ") Jarrod Tranguch, who issued an unfavorable decision dated May 28, 2013. R. 23-35. In August 2014, Roberts filed this present action, seeking court review of the Social Security Administration's decision pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). In August 2015, this matter was referred to the Honorable Timothy R. Rice, United States Magistrate Judge, for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1. Judge Rice's R&R, filed in September 2015, ECF No. 20, recommended that Roberts's request for review be denied and judgment be entered for the Commissioner. Roberts filed objections to the R&R in September 2015, ECF No. 21, and the Commissioner filed a response contesting Roberts's objections in October 2015, ECF No. 23.[1]

**B.  Factual Background**

Roberts's objections to the R&R focus on the Magistrate Judge's consideration of Roberts's mental ailments, the factual background of which is as follows.[2]

---

[1] The Commissioner's response contends that Roberts's objections "essentially reiterate the arguments that he advanced" in his briefing before Judge Rice, and "Plaintiff's argument in these objections is essentially that the Magistrate Judge erred in not accepting the arguments" in his filings. The Commissioner further states that "[b]ecause these issues have already been fully presented in this case, the Commissioner relies upon the reasoning set forth in the Magistrate Judge's Report and Recommendation, as well as the arguments set forth in the Defendant's Response to Request for Review of Plaintiff (Docket No. 14) and respectfully requests that Plaintiff's Objections be denied and the Magistrate Judge's Report and Recommendation be adopted."

[2] The following factual recitation is drawn largely from the Magistrate Judge's account, to which Roberts has not objected.

The Administrative Record contains health records dating back to March 2011. The earliest assessment of Roberts's mental health dates from April 15, 2011, when, following a visit to the emergency room due to chest pains and other symptoms, Roberts was found to be alert and oriented, with normal affect, and his behavior was cooperative. R. at 330, 332. In July 2011, during a visit with his oncologist, Roberts complained for the first time about "an overall sense of sadness." R. at 396. In his September 2011 function report to the Social Security Administration, Roberts wrote that he goes outside alone daily, goes shopping in stores for personal products monthly, and watches television and plays video games with others. R. at 206-209. In response to a question on the function report form concerning his social activities, Roberts reported that his condition had not caused a change in such activities, but rather that he "just [couldn't] work so [he was] not in a sociable environment." R. at 208.

In November 2011, Dr. Anthony Galdieri reviewed Roberts's records and found that his mental impairment was non-severe because Roberts demonstrated only mild limitations in social functioning and concentration and no limitations in activities of daily living, had experienced no periods of decompensation, and had never been treated for mental health issues. R. at 133.

In August 2012, Roberts began seeing Dr. Dustan Barabas for therapy. R. at 410. He attended approximately thirteen sessions with Dr. Barabas through December 2012. R. at 411. In November 2012, Dr. Barabas diagnosed Roberts with panic disorder with agoraphobia and alcohol abuse, assigned him a current Global Assessment Functioning ("GAF") score of 65, and noted that his highest GAF score of the past year was 70. R. at 416.[3] Dr. Barabas noted that

---

[3]    As explained in the R&R, GAF scores, "on a 100-point scale, reflect the mental health specialist's assessment on a particular day of the severity of a patient's mental health, and are based on the patient's state of mind and symptoms." R&R 9-10 n.12 (citing Diagnostic and Statistical Manual of Mental Disorders (4th ed. Am. Psychiatric Assoc. 2000) ("DSM-IV") at 34). "A GAF score in the 61 to 70 range indicates '[s]ome mild symptoms (e.g. depressed mood

3

Roberts "want[ed] to be able/more comfortable leaving his house and being able to interact socially in a more 'normal' manner." *Id.* Dr. Barabas recommended that Roberts follow up with his medical doctors, attend psychotherapy once per week, and avoid alcohol and stimulants, including caffeine and cigarettes. *Id.*

In October 2012, Roberts began seeing Dr. Danilo A. de Soto, a psychiatrist. R. 419. Although Dr. de Soto wrote, in an undated opinion, that he scheduled appointments with Roberts every two weeks, Roberts produced records of only two visits, one in January 2013 and one in February 2013. R. at 422-26. The R&R summarizes Roberts's treatment with Dr. de Soto as follows:

> Dr. DeSoto opined that Roberts was not a malingerer, and that his mental impairment had shown a "minimal response" to his psychiatric medications. [R.] at 421. Dr. DeSoto identified the signs and symptoms of Roberts's mental impairments as: sleep disturbance, recurrent panic attacks, difficulty thinking or concentrating, social withdrawal or isolation, decreased energy, persistent irrational fears, generalized persistent anxiety, and other symptoms "deal[ing] with [the] same social anxiety." *Id.* at 420. He listed his clinical findings as "increased anxiety and frequent panic attacks which interfere with function." *Id.* He further noted that Roberts reported "poor motivation, energy, decreased concentration and focus, increased ruminative thoughts, social anxiety, isolative behavior, [and] insomnia." *Id.* He diagnosed Roberts with generalized anxiety disorder, and assigned him a GAF score of 50. *Id.* at 419. He wrote that Roberts's highest GAF score of the past year was also 50. *Id.*
>
> At Roberts's January 2013 appointment with Dr. DeSoto, he complained of social anxiety, panic, fearful feelings, insomnia, and an inability to concentrate. *Id.* at 422. Roberts told Dr. DeSoto that, although he continued to help his fiancé get the kids ready in the morning for school and take them to the bus stop, he was otherwise staying in the house. *Id.* Dr. DeSoto observed that Roberts showed no signs of acute distress, his motor activity was calm, and although he appeared anxious, his affect was appropriate, his speech was clear, fluent, and spontaneous,

---

and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships,'" whereas a GAF score in the range of 41 to 50 "indicates '[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).'" *Id.* at 9-11 nn.12-13 (quoting DSM-IV at 34).

4

> and his thinking showed no abnormalities. *Id.* at 423. Dr. DeSoto found Roberts's memory was intact and his attention span and concentration were normal. *Id.* at 423. He rated Roberts's current GAF at 50, but found his highest of the past year was 70, and adjusted Roberts's medications. *Id.*
>
> At his February 2013 appointment with Dr. DeSoto, Roberts stated that his condition was "the same." *Id.* at 425. He told Dr. DeSoto that, although he was trying "to stay busy in the house," he still felt he could not leave. *Id.* The results of his mental status examination were again normal, and Dr. DeSoto assigned Roberts a current GAF score of 50 and adjusted his medications. *Id.* at 426.

R&R 10-11. This Court has conducted a de novo review of the medical records and adopts this summary.

At the May 2013 hearing before the ALJ, Roberts testified that he cannot work because he "can't leave [his] house" due to his anxiety. R. at 101. He testified that his condition had worsened since he completed the function report in September 2011 and that for the past six or seven months he had no longer been able to help around the house, fix things, or even play video games, stating that the video game machine "just collect[s] dust now."[4] R. at 105. He testified that his anxiety had made it difficult for him to attend the hearing, and that he misses some doctor's appointments due to his anxiety, but makes some of them because he knows he needs them. R. at 112, 115. He stated that although he continues to live with his girlfriend and her children, he isolates himself in the home, spending most of his time in the attic or basement watching street traffic, and that he interacts with his girlfriend and her children on only a limited basis and does not help care for the children. R. at 113-114. He stated that he has no social activities outside the home whatsoever and never goes out to eat. R. at 117. He explained that he was able to sustain employment before by choosing jobs that did not involve a lot of contact with other people. R. at 118-19.

---

[4] It is not clear from the context of the testimony if Roberts attributes his cessation of these activities to a decline in his mental condition, physical condition, or both.

5

**C.     The ALJ's Assessment of Roberts's Mental Impairments.**

With respect to Roberts's mental impairments, the ALJ determined that Roberts alleged the following symptoms:

> The claimant . . . alleges that he has anxiety. He alleges frequent anxiety attacks and states that he goes into his basement and attic a lot because does not want to be with anyone else. He indicates that he watches street traffic all day. He testified that he never leaves the house, except for doctor appointments, and that he even misses his appointment sometimes. He lives with his girlfriend and her five children. He states that he does not help to care for the children because he cannot "deal with it." He also alleges a limited ability to pay attention. He testified that he takes Klonopin 4 times per day, as well as Zoloft, Seroquel, and Trazodone.

R. 30. Upon review of the evidence, the ALJ concluded that Roberts's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Roberts's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." R. 30. The ALJ based this conclusion on his review of the medical records and the opinion evidence in the record, as follows.

First, with respect to Roberts's medical records, the ALJ found that "[t]he record shows a history of anxiety," and that "[u]pon recent examination, [Roberts] displayed anxiety." R. 31. But the ALJ also found that Roberts's treatment providers had found that Roberts

> had an appropriate affect; clear, fluent and spontaneous speech; cooperative attitude; no aphasia; no apparent agnosia; intact language processing; coherent and logical thought processes; intact associative thinking; no delusions or hallucinations; intact recent and remote memory; normal attention span and concentration; realistic and intact judgment; intact and appropriate insight; and his knowledge and vocabulary are consistent with his education.

R. at 31-32. Further, the ALJ found that Roberts "has reported engaging in daily activities and light exercise and it is noted that he is pleasant, alert, oriented, and displays no thought disorder." R. at 32. The ALJ also found that there was a conflict between Roberts's testimony at the hearing about his social activities and evidence in the record:

6

> Although [Roberts] testified that he isolates himself and does not leave his house, he previously indicated that he leaves the house every day, plays video games with others, and shops monthly. Furthermore, he testified that he does not help care for his girlfriend's five children; however, a medical record dated January 2013 indicates that he helps the children get ready for school and takes them to the bus stop in the mornings.

R. 32 (citations omitted). For these reasons, the ALJ found that "the record does not corroborate [Roberts's] testimony regarding his anxiety symptoms." R. 32.

Second, in reviewing the opinion evidence, the ALJ assigned "moderate weight" to the opinion of Dr. Barabas, in particular citing Dr. Barabas's opinion that Roberts's GAF score was 65, because Dr. Barabas's opinion "was based on at least two evaluations of the claimant and is consistent with medical records as a whole." R. at 32. The ALJ assigned "less weight" to Dr. de Soto's opinion that Roberts had a GAF score of 50, finding that Dr. de Soto's opinion is "not consistent with the medical records, including his own mental status evaluation findings." R. at 33. The ALJ determined that although Dr. de Soto's findings note that Roberts suffered from "anxiety," the doctor's findings also show

> that [Roberts] had an appropriate affect; clear, fluent and spontaneous speech; cooperative attitude; no aphasia; no apparent agnosia; intact language processing; coherent and logical thought processes; intact associative thinking; no delusions or hallucinations; intact recent and remote memory; normal attention span and concentration; realistic and intact judgment; intact and appropriate insight; and knowledge and vocabulary that are consistent with his education.

R. 33. The ALJ concluded that Dr. de Soto's opinions "appear to be based more on [Roberts's] subjective complaints rather than on clinical findings." R. 33. Finally, the ALJ also gave "limited weight" to the opinion of Dr. Galdieri, who had reviewed the records before Roberts began mental health treatment and did not provide a diagnosis. *Id.*

On the basis of his findings, the ALJ listed "anxiety" as one of Roberts's severe impairments, finding that this condition "cause[s] more than a minimal restriction on [Roberts's]

7

ability to perform basic work functions." R. at 25. However, the ALJ found that Roberts's anxiety did not result in a "marked restriction" on Roberts's capabilities. Rather, he determined that Roberts has only "mild restriction" with activities of daily living, based on the following considerations:

> The claimant alleged doing very little of anything during the day aside from staring out the window at traffic. However, the claimant has indicated that he performs minor household repairs, does laundry, cares for his personal needs and that he does not require help or encouragement with such tasks. He also recently reported that he helps his girlfriend's children get ready for school and takes them to the bus stop in the mornings. Thus, the record shows that the claimant's difficulties with activities of daily living are mild.

R. 26. The ALJ also concluded that Roberts has only "moderate difficulties" in social functioning, a conclusion he based on the following considerations:

> The record shows that the claimant experiences social anxiety. However, the claimant has indicated that he leaves the house every day, goes shopping once per month, and watches TV and plays video games with others. He also states that he gets along with authority figures well. Furthermore, upon examination, he had an appropriate affect; clear, fluent and spontaneous speech; a cooperative attitude; no aphasia; no apparent agnosia; and intact language processing. At the hearing, the claimant was polite and cooperative. He did not display any overt indication that he was anxious. He was able to interact appropriately. Thus, the record does not support a finding that the claimant's difficulties in this area are more than moderate.

R. at 27 (citations omitted).

Finally, the ALJ concluded, with respect to the "paragraph C" criteria of 12.06, that the evidence does not show that Roberts's impairment has resulted in a complete inability to function independently outside the area of his home, because Roberts "indicated that he goes outside every day, shops once per month, and attends doctor appointments." R. 28.

The ALJ determined that Roberts has the residual functional capacity ("RFC") to perform light work that is unskilled and involves only "simple, routine tasks; low-stress occupations involving only occasional simple decision-making and occasional changes in the work setting or

in work duties; he can have occasional contact with supervisors and co-workers, involving no team work; and only rare or incidental contact with customers or the general public." R. at 29.

## II. Legal Standards

The Court reviews *de novo* those portions of the R & R to which Roberts has objected. 28 U.S.C. § 636(b)(1); *see also Cont'l Cas. Co. v. Dominick D'Andrea, Inc.*, 150 F.3d 245, 250 (3d Cir. 1998). The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). In reviewing the ALJ's decision, the Court is not permitted to weigh the evidence or substitute its own conclusions for those reached by the ALJ. *See Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002); *Lopez v. Colvin*, No. 13-6923, 2016 WL 1238772, at *1 (E.D. Pa. Mar. 30, 2016). Rather, the Court reviews the ALJ's findings to determine whether they were supported by substantial evidence. 42 U.S.C. § 405(g); *see also Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005).

Substantial evidence is evidence which a "reasonable mind might accept as adequate to support a conclusion." *Rutherford*, 399 F.3d at 552 (internal quotation marks omitted). "It is 'more than a mere scintilla but may be somewhat less than a preponderance of the evidence.'" *Id.* (quoting *Ginsburg v. Richardson*, 436 F.2d 1146, 1148 (3d Cir. 1971)). "If the ALJ's decision is supported by substantial evidence, the Court may not set it aside 'even if [the Court] would have decided the factual inquiry differently.'" *Lopez*, 2016 WL 1238772, at *2 (quoting *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)). The ALJ's decision "must therefore present a sufficient explanation of the final determination in order to provide the reviewing court with the benefit of the factual basis underlying the ultimate disability finding." *D'angelo v. Colvin*, No. 14-6594, 2016 WL 930690, at *1 (E.D. Pa. Mar. 11, 2016) (citing *Cotter v. Harris*, 642 F.2d 700, 704–05 (3d Cir. 1981)). The decision need only discuss the most relevant evidence concerning a

claimant's disability, "but it must provide sufficient discussion to allow the reviewing Court to determine whether its rejection of potentially significant evidence was proper." *Id.* (citing *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203–04 (3d Cir. 2008)).

### III.     Analysis

### A.     Dr. Barabas's Diagnosis of Panic Disorder with Agoraphobia

First, Roberts objects to Judge Rice's finding that the ALJ adequately explained his assessment of Dr. Barabas's opinion and adequately addressed the evidence supporting Roberts's diagnosis of panic disorder with agoraphobia. *See* Pl.'s Obj. 1. Roberts states:

> The record is consistent with Mr. Roberts's contention that panic disorder with agoraphobia affects his ability to leave his home, which he seldom does apart from seeking medical treatment. Yet, the ALJ failed to evaluate the degree to which . . . Mr. Roberts's recurrent panic attacks and agoraphobia impacted his residual functioning capacity . . . or provide reasoning for rejecting the evidence, as required.

*Id.* at 1-2 (footnote omitted).

As Roberts states in his Brief in Support of Request for Review, agoraphobia is "a form of social anxiety" characterized by "[o]verwhelming symptoms of anxiety that occur on leaving home." Pl.'s Br. Supp. Review 6 (quoting *Taber's Cyclopedic Medical Dictionary* 58 (20th ed. 2005)). Although the ALJ did not specifically cite or quote Dr. Barabas's diagnosis of panic disorder with agoraphobia, the ALJ did address Dr. Barabas's opinion, according it moderate weight, and citing in particular his determination that Roberts's GAF was 65. Additionally, the ALJ cited Dr. Barabas's findings that Roberts exhibited an appropriate affect, a cooperative attitude, and logical thought processes. The ALJ also discussed at length the evidence in the record bearing on Roberts's social anxiety and ability to leave his home, and the ALJ's determination of Roberts's residual functional capacity takes Roberts's social anxiety into account, providing that Roberts is limited to jobs in which "he can have occasional contact with

supervisors and co-workers, involving no team work; and only rare or incidental contact with customers or the general public." R. 29. In short, despite the ALJ's failure to specifically cite Dr. Barabas's diagnosis of panic disorder with agoraphobia, it is clear that the ALJ gave full consideration to any limitations caused by this disorder. *See Schuster v. Astrue*, 879 F. Supp. 2d 461, 469 (E.D. Pa. 2012) (affirming ALJ's decision when "the ALJ did not list Plaintiff's back pain among his severe impairments, but she nonetheless gave full consideration to the limitations caused by that pain").

**B.     The ALJ's use of GAF scores**

Roberts contends that the ALJ's reliance on Dr. Barabas's GAF score of 65 was improper because "GAF scores cannot be used as a substitute or proxy for a source's opinion about a claimant's ability to sustain work activities over time." Pl.'s Obj. 3.

A court in this district recently discussed at length the applicability of GAF scores in the Social Security Disability context, observing that although the GAF scale has "fallen somewhat into disfavor" in recent years, a July 2013 Administrative Message from the Social Security Administration noted that the Administration will continue to receive and consider GAF scores as medical opinion evidence, which is to be considered with all of the relevant evidence in the case file. *Nixon v. Colvin*, No. CV 14-4322, 2016 WL 3181853, at *3 (E.D. Pa. June 7, 2016) (quoting *Kroh v. Colvin*, No. 13–1533, 2014 WL 4384675, at *17 (M.D. Pa. Sept. 4, 2014)). Accordingly, a court "looks to the general guidelines concerning the evaluation of opinion evidence to determine how GAF scores should be considered by an ALJ." *Id.* These general guidelines instruct that an ALJ must "'evaluate adequately all relevant evidence,' including GAF scores, and 'explain the basis of his conclusions.'" *Id.* (quoting *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001)).

As set forth above, the ALJ gave moderate (not controlling) weight to Dr. Barabas's opinion that Roberts had a GAF score of 65 and determined that Dr. Barabas's opinion was consistent with other evidence. By contrast, the ALJ assigned "less weight" to Dr. de Soto's opinion that Roberts had a GAF score of 50, finding that Dr. de Soto's opinion is "not consistent with the medical records, including his own mental status evaluation findings." The ALJ did not consider either score as dispositive but rather considered each score in light of other evidence in the record and weighed each score accordingly. Accordingly, Roberts has not shown that the ALJ's use of the GAF scores was improper.

C.     **Roberts's Mental Residual Functional Capacity**

Roberts objects to the Magistrate Judge's recommendation that the ALJ's mental residual functional capacity ("RFC") be deemed supported by substantial evidence. Pl.'s Obj. 5. In reviewing the RFC, the Magistrate Judge observed that the ALJ "explicitly accounts for the impact of a moderate degree of social anxiety . . . by limiting Roberts's exposure to others." R&R 21. Further, the Magistrate Judge found that "the ALJ based his RFC on Roberts's testimony, R. at 30, his treatment history and medication regimen, *id.*, the observations of his treating providers, *id.* at 31-32, the activities he reported to his treating providers, *id.* at 32, his credibility, *id.*, and the medical source opinions, *id.* at 32-33." R&R at 21. Roberts contends that "[a]part from Dr. de Soto's completion of a Mental Impairment Questionnaire, no other providers rendered *any* opinion regarding Mr. Roberts's mental functional limitations," such that "[t]here is simply no medical evidence of Mr. Roberts's work-related functional limitations undergirding the ALJ's RFC formulation." Pl.'s Obj. 6.

Roberts appears to contend that the record lacked adequate evidence to formulate an RFC as to his medical condition. However, it is the claimant's burden to produce evidence about his

or her own medical condition and work history at the RFC evaluation state. *See Wardell v. Astrue*, No. CIV.A. 12-83, 2013 WL 593973, at *7 (W.D. Pa. Jan. 9, 2013), *report and recommendation adopted*, No. CIV.A. 12-83, 2013 WL 593972 (W.D. Pa. Feb. 14, 2013); *Chandler v. Commissioner of Social Security*, 667 F.3d 356, 362 (3d Cir. 2011) ("But the ALJ is not precluded from reaching RFC determinations without outside medical expert review of each fact incorporated into the decision."). The Court agrees with the Magistrate Judge that, in formulating Roberts's RFC, the ALJ appropriately reviewed and accounted for the evidence in the record, including the evidence concerning Roberts's mental ailments, and that the RFC was supported by substantial evidence. Although Roberts may disagree with the manner in which the ALJ weighed the evidence, the ALJ considered all of the relevant evidence and reached his determination on the basis of that evidence.

### D.     Credibility Evaluation

Roberts also raises an objection to the Magistrate Judge's proposed holding that the ALJ correctly evaluated Roberts's credibility. Specifically, with respect to the ALJ's finding that the record did not corroborate Roberts's testimony regarding his anxiety symptoms, Roberts objects that the ALJ "failed to even consider whether there may have been a trend toward deterioration" in Roberts's symptoms. Pl.'s Obj. 8. In particular, Roberts contends that his report to his therapist, five months before the hearing, that he was taking his fiancée's five children to the bus stop daily "does not somehow rule out the potential for worsening to have occurred or negate the evidence of deterioration." Pl.'s Obj. 8.

Roberts is correct that this reported conduct does not eliminate the possibility that, by the time of the hearing, Roberts's condition could have declined to the point that he was no longer able to leave the house on a regular basis. Nevertheless, it was not improper for the ALJ to

13

consider the apparent conflict between this reported activity and Roberts's testimony at the hearing that he did not help care for his girlfriend's children at all. In any event, as the R&R points out, the ALJ's credibility analysis was not based solely on this apparent conflict, but rather was based also on the failure of Roberts's medical records to corroborate his complaints. This lack of corroboration constitutes substantial evidence to support the ALJ's credibility determination with respect to the severity of Roberts's mental impairment symptoms.

**E.     Hypothetical Question to Vocational Expert**

Finally, Roberts objects to the Magistrate Judge's finding that the ALJ relied on a complete hypothetical. Pl.'s Obj. 12. As Roberts acknowledges, this objection is dependent on his earlier objections. *Id.* Because the Court overrules Roberts's other objections, the Court also overrules this objection and finds that the ALJ included all credibly-established limitations in his hypothetical question to the Vocational Expert.

**IV.    Conclusion**

For the reasons stated above, the Court approves and adopts the Report and Recommendation. Roberts's Request for Review is denied and the decision of the Commissioner is affirmed. A separate order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge